**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**TAMPA DIVISION**

|  |  |
|---|---|
| LIFELINK FOUNDATION, INC., ONELEGACY, IOWA DONOR NETWORK, LIFECENTER NORTHWEST, and LIFEGIFT ORGAN DONATION CENTER, <br><br> Plaintiffs, <br><br> v. <br><br> ROBERT FRANCIS KENNEDY JR., in his official capacity as Secretary of Health and Human Services, <br><br> MEHMET OZ, M.D., in his official capacity as Administrator of the Centers for Medicare and Medicaid Services, <br><br> UNITED STATES DEPARTMENT OF HEALTH AND HUMAN SERVICES, <br><br> CENTERS FOR MEDICARE AND MEDICAID SERVICES, <br><br> Defendants. | Case No. 8:25-cv-02042-KKM-SPF |

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND**
**<u>INCORPORATED MEMORANDUM OF LAW</u>**

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES...........................................................................iii

INTRODUCTION ..................................................................................... 1

BACKGROUND ........................................................................................ 5

    A.    The Nation's Organ Procurement System............................. 5

    B.    Congress's Certification Requirements.................................. 8

    C.    CMS's Regulations and 2020 Final Rule..............................11

STANDING................................................................................................ 16

LEGAL STANDARD ............................................................................... 17

ARGUMENT ............................................................................................. 18

I.    The Final Rule's Tier-Ranking Decertification Scheme Violates the Statute's Plain Text and the Requirements of Reasoned Decision-making ..................................................................................... 18

    A.    The Final Rule violates Congress's command to rely on both "process" measures and "multiple outcome" measures..................... 18

        1.    The Final Rule fails to rely on "process" measures................. 19

        2.    The Final Rule fails to apply "multiple" outcome measures....................................................................... 22

    B.    Congress did not authorize CMS to impose a hunger-games style, decertification scheme ........................................ 25

    C.    The Final Rule fails to measure performance "based on" "organ donor potential and other related factors in each service area" ......................................................... 30

II.    The Final Rule's Tiered-Ranking Decertification System Is Arbitrary and Capricious and Not Reasonably Justified............................. 33

A.    CMS's Final Rule relies on data that is filled with errors, significantly fluctuates, and is not a reliable measure of donor potential ................................................................... 34

    1.    CMS's justification is based on a clear misreading of a study ............................................................... 34

    2.    CMS has no reasoned response to evidence establishing that 12-month assessment period is too short ........................................................................... 37

    3.    CMS's calculations fail to account for factors outside the control of any organ procurement organization ................. 38

B.    CMS's outcome metrics do not reasonably or accurately measure performance ......................................................... 40

    1.    CMS has never justified failing to account for factors outside the control of any organ procurement organization ................................................................... 40

    2.    CMS provides no reasoned basis for applying a 25% cutoff that threatens to decertify or replace dozens of organizations ........................................................... 43

C.    CMS's methodology is statistically biased ....................................... 44

III.    The Final Rule Fails to Respond to Significant Comments About the Consequences for Patients and the Nation's Donation Network.................. 46

CONCLUSION ............................................................................... 49

ii

# TABLE OF AUTHORITIES

**Cases**

*AARP v. EEOC*,
   267 F. Supp. 3d 14 (D.D.C. 2017) ....................................................................... 43

*Am. Farm Bureau Fed'n v. EPA*,
   559 F.3d 512 (D.C. Cir. 2009) ........................................................................... 41

*Am. Radio Relay League, Inc. v. FCC*,
   524 F.3d 227 (D.C. Cir. 2008) ........................................................................... 41

*Am. Sec. Ass'n v. SEC*,
   147 F.4th 1264 (11th Cir. 2025) ................................................................... 17, 49

*Ark. Reg'l Organ Recovery Agency, Inc. v. Shalala*,
   104 F. Supp. 2d 1084 (E.D. Ark. 2000) ......................................................... 30, 41

*Ass'n of Priv. Colls. & Univs. v. Duncan*,
   870 F. Supp. 2d 133 (D.D.C. 2012) ................................................................... 44

*Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*,
   961 F.2d 269 (D.C. Cir. 1992) ........................................................................... 44

*Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*,
   419 U.S. 281 (1974) .......................................................................................... 37

*Brown v. Ent. Merchants Ass'n*,
   564 U.S. 786 (2011) .......................................................................................... 36

*Cablevision Sys. Corp. v. FCC*,
   649 F.3d 695 (D.C. Cir. 2011) ........................................................................... 40

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) ........................................................................... 43

*Caster v. Allen*,
   2025 WL 1643532 (N.D. Ala. May 8, 2025) ....................................................... 19

*Cobell v. Salzar*,
   573 F.3d 808 (D.C. Cir. 2009) ........................................................................... 39

*Constellation Mystic Power, LLC v. FERC*,
   45 F.4th 1028 (D.C. Cir. 2022) ......................................................................... 33

*Corely v. United States*,
  556 U.S. 303 (2009)..................................................................... 27

*Datamax Applied Techs., Inc. v. Brown & Brown, Inc.*,
  2022 WL 3597311 (11th Cir. Aug. 23, 2022) ..................................... 35

*Eagle Healthcare, Inc. v. Shalala*,
  52 F. Supp. 2d 1(D.D.C. 1999) ..................................................40, 45

*Emera Me. v. FERC*,
  854 F.3d 9 (D.C. Cir. 2017)........................................................... 34

*FCC v. Prometheus Radio Project*,
  592 U.S. 414 (2021)..................................................................... 17

*Food Mktg. Inst. v. Argus Leader Media*,
  588 U.S. 427 (2019)..................................................................... 27

*Fred Meyer Stores, Inc. v. NLRB*,
  865 F.3d 630 (D.C. Cir. 2017) ....................................................... 46

*Ga. Dep't of Educ. v. U.S. Dep't of Educ.*,
  883 F.3d 1311 (11th Cir. 2018)....................................................... 18

*Ga. Pub. Serv. Comm'n v. United States*,
  704 F.2d 538 (11th Cir. 1983) ....................................................... 36

*Gen. Chem. Corp. v. United States*,
  817 F.2d 844 (D.C. Cir. 1987)....................................................... 47

*Grand Canyon Air Tour Coal. v. FAA*,
  154 F.3d 455 (D.C. Cir. 1998).....................................................38, 46

*Greater Yellowstone Coal. v. Kempthorne*,
  577 F. Supp. 2d 183 (D.D.C. 2008)................................................. 36

*Gresham v. Azar*,
  950 F.3d 93 (D.C. Cir. 2020)......................................................... 46

*Hibbs v. Winn*,
  542 U.S. 88 (2004) ..................................................................... 27

*In re Gateway Radiology Consultants, P.A.*,
  983 F.3d 1239 (11th Cir. 2020)....................................................... 18

iv

*Ins. Mktg. Coal. Ltd. v. FCC,*
  127 F.4th 303 (11th Cir. 2025) ............................................................ 49

*Int'l Harvester Co. v. Missouri,*
  234 U.S. 199 (1914)............................................................................ 26

*Int'l Ladies' Garment Workers' Union v. Donovan,*
  722 F.2d 795 (D.C. Cir. 1983)............................................................ 33

*Koons Buick Pontiac GMC, Inc. v. Nigh,*
  543 U.S. 50  (2004) ............................................................................ 26

*La. Wildlife Fed'n, Inc. v. York,*
  761 F.2d 1044 (5th Cir. 1985) ............................................................ 36

*Lands Council v. Powell,*
  395 F.3d 1019 (9th Cir.),
  *as amended* (Jan. 24, 2005) ............................................................... 37

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024)............................................................................ 17

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992)............................................................................ 16

*Mitchell v. Adams,*
  230 F.2d 527 (5th Cir. 1956) ............................................................. 26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc.*
  *v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ................................................................. 18, 33, 42

*Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.,*
  595 U.S. 109 (2022)............................................................................ 17

*Perez v. Mortg. Bankers Ass'n,*
  575 U.S. 92 (2015) .........................................................................18, 46

*Petroleum Commc'ns, Inc. v. FCC,*
  22 F.3d 1164 (D.C. Cir. 1994)........................................................... 43

*Qwest Corp. v. FCC,*
  258 F.3d 1191 (10th Cir. 2001).......................................................... 26

*TRW Inc. v. Andrews*,
 534 U.S. 19 (2001) ................................................................... 28

*Turner v. U.S. Att'y Gen.*,
 130 F.4th 1254 (11th Cir. 2025) ................................................ 19

*Uniloc USA, Inc. v. Microsoft Corp.*,
 632 F.3d 1292 (Fed. Cir. 2011) ................................................. 44

*United States v. McLymont*,
 45 F.3d 400 (11th Cir. 1995) ..................................................... 20

*Va. Uranium, Inc. v. Warren*,
 587 U.S. 761 (2019) .................................................................. 26

*West Virginia v. EPA*,
 597 U.S. 697 (2022) .................................................................. 17

*Westar Energy, Inc. v. FERC*,
 473 F.3d 1239 (D.C. Cir. 2007) ................................................ 45

*Xunbing Liu v. U.S. Att'y Gen.*,
 440 F. App'x 718 (11th Cir. 2011) ............................................. 18

**Statutes**

5 U.S.C. § 706(2) ............................................................... 1, 4, 17

42 U.S.C. § 273(a) .................................................................... 6

42 U.S.C. § 273(b) ............................................................ *passim*

42 U.S.C. § 273 note ......................................................... *passim*

42 U.S.C. § 274 ................................................................ 2, 7, 8

42 U.S.C. § 274c .............................................................. 2, 23

42 U.S.C. § 274f-1 ............................................................ 2, 8

42 U.S.C. § 274f-2 ............................................................... 2

42 U.S.C. § 274f-3 ........................................................ 2, 8, 27

42 U.S.C. § 274f-4 ........................................................... *passim*

42 U.S.C. § 300y(a) .................................................................... 11

42 U.S.C. § 1395cc(k)(4) ............................................................ 11

42 U.S.C. § 1395cc-4(c)(4) ......................................................... 11

Organ Procurement Organization Act of 2000,
    Pub. L. No. 106-505, 114 Stat. 2346 (2000) ............................... 9, 10, 27

**Regulations**

42 C.F.R. § 486.302 ................................................................... 14

42 C.F.R. § 486.308 ..................................................................... 6

42 C.F.R. § 486.310(b) (1995) ..................................................... 9

42 C.F.R. § 486.316 ............................................................*passim*

42 C.F.R. § 486.318 ........................................................ 12, 14, 15

42 C.F.R. §§ 486.320–486.360 ................................................... 12

42 C.F.R. § 512.547 ................................................................... 37

71 Fed. Reg. 30,982 (May 31, 2006) ......................................... 12

78 Fed. Reg. 43,534 (July 19, 2013) .......................................... 12

80 Fed. Reg. 13,569 (Mar. 16, 2015) ......................................... 20

81 Fed. Reg. 79,562 (Nov. 14, 2016) ...................................... 12, 13

84 Fed. Reg. 47,956 (Sept. 11, 2019) ...................................... 20, 21

84 Fed. Reg. 70,628 (Dec. 23, 2019) (RR-53–135) ...................... 13

85 Fed. Reg. 77,898 (Dec. 2, 2020) (RR-1–52) ...................*passim*

**Other Authorities**

Agency for Health Rsch.& Quality,
    *Types of Health Care Quality Measures* (July 2015),
    https://www.ahrq.gov/talkingquality/measures/types.html ........................... 11

Baker, David W. & Mark R. Chassin,
   *Holding Providers Accountable for Health Care Outcomes*,
   167 Annals of Internal Med. 418 (2017) .......................................................... 22

GAO,
   No. GAO/HEHS-98-26, Organ Procurement Organizations:
   Alternatives Being Developed to More Accurately Assess
   Performance (Nov. 1997) ................................................................................ 10

GAO,
   No. GAO/T-HEHS-98-131, Organ Donation:
   Assessing Performance of Organ Procurement Organizations
   (Apr. 8, 1998) ................................................................................................... 31

Goldberg, David S., et al.,
   *Addressing Critiques of the Proposed CMS Metric*
   *of Organ Procurement Organ Performance: More Data Isn't Better*,
   104 Transplantation 1662 (2020) ..................................................................... 35

Inst. of Med. (US) Comm.
   on Organ Procurement & Transplantation Pol'y,
   Organ Procurement and Transplantation (1999) ............................................. 10

Lilford, Richard J., et al.,
   *Use of Process Measures to Monitor the Quality of Clinical Practice*,
   335 BMJ 648, 649 (2007), *available at* https://pmc.ncbi.nlm.nih.gov/
   articles/PMC1995522/ ..................................................................................... 21

Lopez, Rocio, et al.
   *Evaluation of the Stability of Organ Procurement Organization*
   *Performance Metrics*, 25 Am. J. Transplantation 2151 (2025) ........................ 15

Lyden, G., et al.,
   *Are the New CMS Performance Tiers Biased Against Larger OPOs?*,
   24 Am. J. Transplantation S531 (2024) ........................................................... 45

Miller, Jonathan M., et al.,
   *Adjusting for Race in Metrics of Organ Procurement Organization*
   *Performance*, 24 Am. J. Transplantation 1440 (2024) ..................................... 16

OPM,
   Guiding Principles for Performance Measurement—
   A Supervisor's Quick Guide (2025) ................................................................. 21

Schold, Jesse D., et al.,
  *Are the Centers for Medicare & Medicaid Services Metrics*
  *Evaluating Organ Procurement Organization Performance Too Fragile?*,
  24 Am. J. Transplantation 1336 (2024) ............................................................ 16

Snyder, Jon J., et al.,
  *The Centers for Medicare and Medicaid Services' Proposed Metrics for*
  *Recertification of Organ Procurement Organizations: Evaluation by the*
  *Scientific Registry of Transplant Recipients*, 20 Am. J. Transplantation
  2466 (2020) ...................................................................................................... 16

*Types of Health Care Quality Measures*,
  https://www.ahrq.gov/talkingquality/measures/types.html ............................ 21

**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND INCORPORATED MEMORANDUM OF LAW**

Plaintiffs LifeLink Foundation, Inc., OneLegacy, Iowa Donor Network, LifeCenter Northwest, and LifeGift Organ Donation Center ("Plaintiffs"), by counsel and pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, Local Rule 3.01, and this Court's September 18, 2025 Order, move this Court for entry of summary judgment on their claims that CMS's Final Rule, RR-1 (85 Fed. Reg. 77,898 (Dec. 2, 2020)), is contrary to law, in excess of statutory jurisdiction and authority, and violates the requirements of reasoned decision-making. 5 U.S.C. § 706(2)(A), (C).

**INTRODUCTION**

The nation's organ donation and transplantation system depends on 55 non-profit organ procurement organizations that work within their individually assigned service areas to increase organ donation, support donors and their families, and facilitate the recovery and transport of donated organs. Congress structured the nation's system to allow these organizations to develop the longstanding relationships of trust, and gain the experience necessary, to ensure the equitable distribution of organs and overcome the different barriers to donation within their local communities. 42 U.S.C. § 273(b). As a result, the United States is a leader in donation and transplantation, saving more lives than any other country, Compl. ¶ 21, and donation rates have steadily increased, *see id.* ¶ 50.

Recognizing the importance of government being a partner in these efforts, Congress directed the Centers for Medicare and Medicaid Services ("CMS") to

identify "the most effective donation and recovery practices," establish appropriate "performance standards," and apply those standards when certifying and recertifying qualified organizations. *See* 42 U.S.C. §§ 273(b)(1)(D), 274f-4(c); *see also id*. §§ 274, 274c, 274f-1, 274f-2, 274f-3, 274f-4. No one disputes the need to hold organ procurement organizations to high standards or the importance of increasing the number of successfully donated and transplanted organs. Unfortunately, for decades CMS has fallen short of Congress's expectations. Instead of working to help organ procurement organizations implement best practices and processes, and instead of evaluating the varied barriers to donation that exist in different service areas, CMS cut corners. It assessed performance based only on limited, narrowly focused outcome metrics that Congress and other government watchdogs criticized because they were inaccurate, created unnecessary "uncertainty," and failed to "reflect the relative capability and performance" of organizations in their assigned service areas. *See* 42 U.S.C. § 273 note.

In 2000, recognizing that CMS's failed oversight was "interfering with the effectiveness of organ procurement organizations in raising the level of organ donation," Congress amended the statute. *Id*. Congress mandated that the agency must evaluate the performance of organizations no "more frequently than once every four years," rely on both "process" and "multiple outcome" measures when making recertification decisions, and test those measures to ensure that they accurately and reliably measure performance. *Id.* § 273(b)(1)(D)(i), (ii); *see also id*. § 273 note.

2

CMS has never fully complied with Congress's directions, and its poor oversight has prompted calls for reform. A reasonable recertification process would require determining which organizations are implementing the most effective processes for facilitating organ donation; rewarding organizations that innovate and are dedicated to serving donors and their families; and taking account of the real-world challenges to donation that depend on different local conditions, different attitudes toward donation, and other obstacles to recovering and transporting organs, many of which are outside the control of the organizations themselves.

In 2020, CMS promulgated its Final Rule. *See* RR-1 (85 Fed. Reg. 77,898). Instead of remedying its past failures, CMS adopted a more radical and regressive version of the narrow outcome-focused approach that Congress rejected. The Final Rule not only fails to utilize accurate and reasonable performance standards, it establishes an arbitrary recertification process that, by CMS's own estimates, will subject large numbers of organizations to decertification or potential replacement, sending the nation's organ donation system into abject chaos. There are at least three reasons the Final Rule is unlawful.

*First*, the Final Rule violates the statute. Instead of relying on both "process" and "multiple outcome" measures to evaluate performance over a four-year period, as Congress directed, it applies only two-limited outcome metrics—donation rate and transplantation rate—calculated using 12 months of data. CMS applies the two outcome metrics to assign organizations to one of three tiers, and it will decertify or potentially replace any organization not within the top 25% (and, therefore, not

3

assigned to Tier 1). Because the two metrics have the same denominator—a calculation of organ donor potential—they operate practically as a single measure of performance. CMS has never justified its failure to comply with Congress's mandate to rely on both process and multiple outcome measures when making recertification decisions. Nor has the agency identified anything in the statute granting it authority to decertify or replace organizations using an arbitrary 25% cut-off that depends on an imprecise comparison of donation and transplantation rates, with no judgment as to what fixed level of performance is acceptable. Moreover, although the ranking system depends solely on comparing donation and transplantation rates, CMS has refused to take into account the many factors besides an organization's performance that affect and determine donation and transplantation in different service areas.

*Second*, CMS's Final Rule violates the requirements of reasoned decision-making under the Administrative Procedure Act. *See* 5 U.S.C. § 706(2). Instead of adopting robust, non-arbitrary measures of actual performance, CMS's metrics depend on data that CMS acknowledges is rife with errors. RR-9. Although CMS contends that using other data would not change how organizations are ranked, the only study it cites does not support its position, and other studies demonstrate that the flawed data is material to CMS's rankings. The difference between being deemed a top performer (Tier 1) and being potentially replaced (Tier 2) or decertified (Tier 3) can turn on small differences in calculated rates, and CMS has never explained how those differences reflect genuine, meaningful differences in actual performance. CMS has not reasonably responded to record evidence demonstrating that its data fluctuates

4

significantly over each 12-month period and does not accurately reflect multiple factors that affect the outcomes CMS is purporting to measure. It has no reasoned explanation for refusing to consider the myriad challenges to donation that exist in different service areas. Nor does it offer any reasoned response to evidence that its metrics are systematically biased against larger organizations.

*Third*, CMS has never responded to significant objections that its mechanical application of flawed, outcome-focused metrics will have destabilizing and disruptive consequences that will reduce organ donation, harm patients, and undermine trust in the system. CMS assumes that if it decertifies or replaces potentially dozens of organ procurement organizations, there will be other organizations capable of stepping in and increasing donation and transplantation rates in the service areas they take over. But it provides no record support for that unfounded assumption. Nor can it deny the severe harm that will be caused if its unreliable metrics result in decertifying or replacing the wrong organizations. Because CMS retains authority outside the four-year recertification process to respond when an organization engages in wrong-doing or fails to meet minimum performance standards for patient safety, there is no reason it should be permitted to implement its draconian and unlawful recertification scheme.

The Final Rule should be vacated.

## BACKGROUND

### A.    The Nation's Organ Procurement System

Organ transplantation is a miracle of modern medicine that provides transplant recipients with a second chance at a healthy, productive life. Because there are never

enough donated organs to serve patients in need, and because patients waiting for an organ transplant deserve to be treated fairly, Congress has carefully regulated the processes through which organs are donated and shared across the United States. *See* Compl. ¶¶ 51, 53.

In 1984, Congress enacted the National Organ Transplant Act to create a nationwide system of "donation service areas" structured to "assure maximum effectiveness in the procurement and equitable distribution of organs." 42 U.S.C. § 273(b)(1)(E). Each area is served by a single "organ procurement organization," a non-profit entity that oversees the complex process of organ donation. *See id.* § 273(a), (b)(1)(F); *see also* 42 C.F.R. § 486.308(a) ("CMS designates only one OPO per service area"). There are 55 such organizations across the country. Compl. ¶ 56. In each service area, the assigned organization identifies potential donors; undertakes essential community outreach; and works with local hospitals, physicians, and transplant programs to ensure that organs reach patients in need. *See id.* ¶ 57.

The nation's donation service areas differ meaningfully in size, geography, and demographics. *See id.* ¶ 59 (map). There are many local factors—including death rates, educational attainment, cultural and religious attitudes toward donation, causes of death and secondary diagnoses (which allow for or prevent donation), donor hospital and transplant center performance and concentration—that materially influence the number of donated and transplanted organs in each service area. *See id.* ¶¶ 51, 60. Because barriers to donation vary significantly depending on local conditions and preferences, Congress designed the system to ensure that organ procurement

6

organizations are able to develop the longstanding, stable, and trusting relationships necessary to promote community engagement and build trust in organ donation. *See, e.g.*, 42 U.S.C. § 273(b)(1)(G)(i) (requiring each organization to have a board of directors or advisory board composed of members who represent healthcare personnel, transplant center surgeons, and "the public residing" in the service area).

Congress also focused on the importance of implementing proven processes for facilitating and increasing organ donation. The statute requires each organization to "conduct and participate in systematic efforts, including professional education, to acquire all useable organs from potential donors." 42 U.S.C. § 273(b)(3)(B). It also requires that each organization "have a system to allocate donated organs equitably among transplant patients," "coordinate its activities with transplant centers in its service area," execute "effective agreements" with the "hospitals and other health care entities in its service area," and "evaluate annually the effectiveness of the organization in acquiring potentially available organs." *Id.* § 273(b)(3)(A), (E), (G), (J).

Recognizing that misguided regulation could impede efforts to increase the number of successfully donated and transplanted organs, Congress provided specific directions to CMS for overseeing the program. The statute instructs CMS to work with the Organ Procurement and Transplantation Network ("OPTN"), a public-private partnership that links professionals involved in organ donation and transplantation. *See id.* § 274(a); Compl. ¶ 53. The OPTN is required to "adopt and use standards of quality for the acquisition and transportation of donated organs," carry out "studies and demonstration projects for the purpose of improving procedures for organ

7

procurement and allocation," and prepare an annual report "containing information" on "comparative costs and patient outcomes at each transplant center." 42 U.S.C. § 274(b)(2)(E), (J), (L). In coordination with the OPTN, CMS is obligated to support the development and dissemination of educational materials that address "evidence-based proven methods to approach patients and their families, cultural sensitivities, and other relevant issues." *Id.* § 274f-1(d).

Other statutory requirements underscore Congress's intent that CMS work with organizations to adopt the processes and best practices necessary to increase organ donation. The statute mandates that CMS must "develop evidence and promote the adoption" of "proven practices." *Id*. § 274f-3(b). It also must evaluate the effectiveness of "activities" that affect organ donation, *id*. § 274f-4(a) and develop a plan to establish "baselines and benchmarks to measure overall outcomes" of activities that support donation and recovery. *Id*. § 274f-4(c)(5).

### B.    Congress's Certification Requirements

To ensure that organ procurement organizations meet expectations while preventing CMS regulation from disrupting the system, Congress directed CMS to establish "performance standards" for recertifying organizations "not more frequently than once every four years" by evaluating their performance against objective, evidence-based criteria. 42 U.S.C. § 273(b)(1)(D). Accurate performance standards are crucial because decertification is an effective "death penalty" that prohibits an organization from participating in the nation's donation system. When an organization is improperly decertified or replaced, it can cause substantial harm to

donor families and organ recipients who rely on the community-focused services and relationships that each organization has spent years developing. *See* Compl. ¶ 71.

CMS has long struggled to meet its statutory obligations. Instead of implementing performance "standards" that evaluate organizations' efforts to overcome the challenges to donation in their respective service areas, CMS's recertification process has relied exclusively on limited, imprecise outcome metrics. In its 1995 rulemaking, CMS assessed performance based only on a calculation of the number of organ donors and transplants over a two-year cycle. CMS deemed organizations satisfactory if their recovery and transplant rates were within 1.75 standard deviations of the national mean. *See* 42 C.F.R. § 486.310(b) (1995).

These outcome metrics were widely criticized—because they did not accurately or fairly measure performance—and, in response, Congress enacted the Organ Procurement Organization Act of 2000, Pub. L. No. 106-505, 114 Stat. 2346 (2000). Congress rejected CMS's approach because the agency did "not permit consideration of other outcome and process standards that would more accurately reflect the *relative* capability and performance of each organ procurement organization." *Id*. at 2346 (emphasis added). Citing reports and studies prepared by the General Accounting Office, the Institute of Medicine, and the Harvard School of Public Health, Congress did not mince words: CMS's flawed recertification process had "created a level of uncertainty" that was "interfering" with efforts to increase "the level of organ donation." *Id*. Congress found that CMS was not accurately measuring performance because its outcome metrics did not account for differences in service areas, including

9

death rates, race and ethnicity, economic disparity, and hospital and transplant center concentration. *See* GAO, No. GAO/HEHS-98-26, Organ Procurement Organizations: Alternatives Being Developed to More Accurately Assess Performance (Nov. 1997). CMS had failed to develop a statistically valid method for assessing donor potential in each service area and "other performance criteria [were] needed." Inst. of Med. (US) Comm. on Organ Procurement & Transplantation Pol'y, Organ Procurement and Transplantation 58 (1999).

In formal findings, Congress directed CMS to "develop improved performance measures that would reflect organ donor potential and interim outcomes" and "test" those measures to "ensure that they accurately measure performance differences among the organ procurement organizations." 114 Stat. at 2347. It also directed CMS to increase the recertification cycle from two to at least four years, expressing its intent that CMS would "use [that] extended period" to "improve the overall certification process by incorporating process as well as outcome performance measures." *Id*.

The statute's plain text reflects Congress's findings. Congress directed CMS to promulgate regulations that (1) require recertification of qualified organ procurement organizations "not more frequently than once every 4 years," (2) "rely on *outcome* and *process* performance measures that are based on empirical evidence … of organ donor potential *and other related factors in each service area*," (3) "use *multiple outcome measures as part of* the certification process," and (4) allow for an administrative appeal of any decertification decision "on substantive and procedural grounds." 42 U.S.C. § 273(b)(1)(D)(ii) (emphasis added).

10

Congress's instruction that four-year recertification decisions must rely on both "process" and "multiple outcome" measures, and that those measures be based on "related factors" beyond organ donor potential "in each service area," is consistent with accepted understandings that limited outcome metrics are not effective, accurate, or reliable measures of performance. *See* Compl. ¶¶ 69–70. Utilizing limited outcome metrics is improper because "an outcome is the result of numerous factors, many beyond providers' control." Agency for Health Rsch.& Quality, *Types of Health Care Quality Measures* (July 2015), https://www.ahrq.gov/talkingquality/measures/types. html. Congress's instructions here are consistent with many other areas in the healthcare sector, where it is understood that making decisions based on outcomes alone is improper. *See* 42 U.S.C. § 1395cc-4(c)(4) (directing HHS to establish "quality measures of process, outcome, and structure[] related to care"); 42 U.S.C. § 300y(a) (directing HHS to develop "performance measures including capacity, process, and outcomes measures"); 42 U.S.C. § 1395cc(k)(4) (directing HHS to report "quality measures of process, structure, [and] outcome[]").

### C.    CMS's Regulations and 2020 Final Rule

Despite Congress's clear directions in 2000, CMS made no reforms for more than five years. In 2006, and continuing for more than a decade, CMS promulgated regulations that made its recertification decisions depend on limited "outcome" metrics that even CMS eventually recognized were inappropriate.

***CMS's History of Regulations.*** In 2006, CMS established new conditions for coverage and, in that context, imposed several process and outcome requirements. *See*

11

42 C.F.R. § 486.318 (outcome requirements); *id.* §§ 486.320–486.360 (process requirements). In structuring its recertification process, however, CMS refused to evaluate performance using process measures or to account for the varied "barriers" to donation that exist in different service areas. Instead, its 2006 regulations took the same type of approach that Congress had rejected. Regardless of the efforts made by an organization to increase organ donation and the specific challenges faced in its assigned service area, the organization would be decertified if it did not satisfy three limited outcome-focused requirements—the number of eligible donors as a percentage of eligible deaths, the observed donation rate as a percentage of an expected donation rate, and the number of organs transplanted or used for research per donor ("yield"). *See* 71 Fed. Reg. 30,982, 30,985, 31,005, 31,050 (May 31, 2006); *see also* 42 C.F.R. § 486.316.

CMS soon recognized that it lacked sufficient data, and it later acknowledged that its limited outcome metrics raised "concerns," including because substantial variation in demographics between service areas could "have a significant impact on the organ yield that could reasonably be expected …." 78 Fed. Reg. 43,534, 43,671 (July 19, 2013). It also acknowledged that even organizations that were "performing satisfactorily" might fail its limited outcome metrics, which were "unnecessarily stringent" and could result in "inappropriate enforcement action." *Id.* at 43,671–72.

In the 2017 regulations, CMS "risk adjusted" its methodology to take account of "29 donor medical characteristics and social complexities" of the donor pool in different service areas. *See* 81 Fed. Reg. 79,562, 79,830–35 (Nov. 14, 2016). CMS

explained that these adjustments resulted in "a more accurate measure" of performance that "accounts for differences between donor case-mixes across" service areas. *Id*. at 79,832. Unfortunately, even as donation rates continued to increase, these praiseworthy and much-needed reforms were short lived.

In 2019, CMS reversed course and proposed to eliminate any consideration of the varying medical characteristics and social complexities of the different service areas, reverting to the same outcome-focused approach that Congress had rejected. Although CMS admitted that limited "outcome measures" were "not sufficiently objective and transparent to ensure public trust in assessing [organizational] performance," and did not "properly incentivize the adoption of best practices and optimization of donation and organ placement rates," RR-53–54 (84 Fed. Reg. 70,628, 70,628–29 (Dec. 23, 2019)), it failed to address those issues. Instead of applying process and multiple outcome measures, and instead of considering related factors "in each service area" beyond organ donor potential, CMS proposed to make recertification depend on only two, interrelated outcome metrics—donation rate and transplantation rate. Both metrics are based on a calculation of organ donor potential using data that CMS admits has high error rates. *See* Compl. ¶ 93; *see also* RR-9.

CMS received extensive comments and objections. *See* Compl. ¶ 94; *see also* RR-136–1888. Commenters noted that the proposed donation rate (based on inaccurate and highly misleading data) was not an accurate measure of performance, and the transplantation rate would vary for reasons largely beyond the control of any organ procurement organization. *E.g.*, RR-815–816, RR-1043. The agency's calculations

failed to account for variations in service areas and utilized data that did not properly assess donor potential, meaning that the two metrics are not reliable or accurate measures of performance. *E.g.*, RR-983, RR-1643. More broadly, comments expressed concern that the agency's proposed rule would cause systemic disruption by punishing well-performing organizations, interfering with patient care, and threatening dozens of organizations with decertification. *E.g.* RR-178.

*CMS's Final Rule.* CMS did not modify its proposed rule; instead, it doubled down. On December 2, 2020, CMS promulgated its Final Rule, which generally took effect on February 1, 2021, and was implemented on August 1, 2022, to coincide with the start of the 2022–2026 recertification cycle. RR-1 (85 Fed. Reg. 77,898).

The Final Rule creates a new recertification scheme that assigns an organization to one of three tiers based only on its donation rate and transplantation rate calculated over a single 12-month period. *See* RR-50–51 (42 C.F.R. §§ 486.302, 486.316). The new tier-ranking system decertifies or potentially replaces organizations through the mechanical application of arbitrary cut-offs derived from comparing organizations' calculated donation and transplantation rates but without CMS making any determination as to what constitutes acceptable performance in an absolute sense. An organization is assigned to Tier 1—and deemed satisfactory—if it has both a donation rate and a transplantation rate in the top 25% of all organizations. *See* 42 C.F.R. §§ 486.316(a)(1), 486.318(e)(4). An organization is assigned to Tier 2—and subject to potential replacement and removal from its service area—if it has a donation and transplantation rate that are both above the mean threshold rate but either rate is below

14

the top 25% for all organizations. *See* 42 C.F.R. §§ 486.316(a)(2), 486.318(e)(5). An organization is assigned to Tier 3—and decertified—if it is below the mean threshold for either its donation rate or its transplantation rate. *See* 42 C.F.R. §§ 486.316(a)(3), 486.318(e)(6). The tier to which an organization is assigned can often turn on as little as the difference between 1 or 2 transplanted organs. *See* Compl. ¶ 111; *see also* RR-29–33 (tables 1, 2, and 3).

CMS's new recertification scheme does not include any process measures and, because the two outcome metrics are calculated using the same denominator, they do not qualify as "multiple" outcome measures. Moreover, CMS's new scheme forces consolidation over time, with an ever-shrinking group of organizations falling within the top 25% of the remaining organizations that have not (yet) been decertified. There are no procedures that allow for a change in tier ranking even if CMS's 12 months of data is inconsistent with overall performance over the four-year recertification period. Moreover, once CMS assigns an organization to a tier, there is no process for the organization to respond to specific performance issues to avoid decertification or possible replacement. *See* Compl. ¶ 113; *see also* RR-19.

The problems inhering in the Final Rule's recertification regime have been confirmed since its inception. The tier rankings are not reliable, and the data used to calculate donation and transplantation rates fluctuates significantly. *See* Compl. ¶ 115 (chart); Compl. Ex. L at 1 (Rocio Lopez et al., *Evaluation of the Stability of Organ Procurement Organization Performance Metrics*, 25 Am. J. Transplantation 2151 (2025)) (noting "significant year-to-year variability" in tier rating "with up to 40% of OPOs

15

changing tiers annually").[1] But CMS has refused to change its approach and is poised to decertify dozens of organ procurement organizations or potentially reassign their service areas.

With no remaining options, plaintiffs filed this litigation on August 1, 2025. Because CMS could begin decertifying organizations as early as June 2026, the parties negotiated an expedited briefing schedule, and plaintiffs respectfully seek a decision at the Court's earliest convenience.

## STANDING

Plaintiffs commented on and are the direct objects of CMS's Final Rule. *See* Compl. ¶¶ 168–185; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992) (standing is rarely in doubt when plaintiff "is … an object" of agency regulation). Attached to the complaint are declarations setting forth the basis for plaintiffs' standing and the substantial, concrete injuries the rule is causing. *See* Compl. Exs. A–H. Although there is an administrative process that may be used for challenging CMS's decertification decisions, that process does not allow any organization to challenge the legality of the

---

[1] *See also* Compl. Ex. J at 6 (Jonathan M. Miller et al., *Adjusting for Race in Metrics of Organ Procurement Organization Performance*, 24 Am. J. Transplantation 1440 (2024)) (explaining that failing to adjust for race "puts OPOs that are currently performing well among minorities relative to national rates at risk of immediate decertification"); Compl. Ex. M (Jesse D. Schold et al., *Are the Centers for Medicare & Medicaid Services Metrics Evaluating Organ Procurement Organization Performance Too Fragile?*, 24 Am. J. Transplantation 1336 (2024)); Compl. Ex. P (Jon J. Snyder et al., *The Centers for Medicare and Medicaid Services' Proposed Metrics for Recertification of Organ Procurement Organizations: Evaluation by the Scientific Registry of Transplant Recipients*, 20 Am. J. Transplantation 2466 (2020)).

Final Rule and its failure to comply with statutory requirements, including the requirements of the Administrative Procedure Act. *See* Compl. ¶ 177.

## LEGAL STANDARD

The Administrative Procedure Act instructs courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Courts also must set aside agency action that is "in excess of" an agency's "authority," taken "without observance of procedure required by law," or not supported by "substantial evidence." *Id.* § 706(2)(C), (D), (E).

When interpreting a statute, "courts must exercise independent judgment" and "use every tool at their disposal to determine the best reading" without deference to the agency's views. *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 394, 400 (2024). Because agencies are "creatures of statute," they "possess only the authority that Congress has provided." *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab.*, 595 U.S. 109, 117 (2022) (per curiam). Enabling legislation is "not an open book to which an agency [may] add pages and change the plot line." *West Virginia v. EPA*, 597 U.S. 697, 723 (2022).

Agency actions also must be "reasonable and reasonably explained." *Am. Sec. Ass'n v. SEC*, 147 F.4th 1264, 1277 (11th Cir. 2025) (quoting *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021)). An agency "must examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v.*

17

*State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Agency action is unlawful if the

agency fails "to consider an important aspect of the problem," *In re Gateway Radiology*

*Consultants, P.A.*, 983 F.3d 1239, 1262 (11th Cir. 2020) (quoting *Ga. Dep't of Educ. v.*

*U.S. Dep't of Educ.*, 883 F.3d 1311, 1314 (11th Cir. 2018)), neglects to respond to

"significant comments," *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015), misstates

the record, or does not adequately explain "illogical conclusions," *Xunbing Liu v. U.S.*

*Att'y Gen.*, 440 F. App'x 718, 719 (11th Cir. 2011) (per curiam).

### ARGUMENT

**I.    The Final Rule's Tier-Ranking Decertification Scheme Violates the Statute's Plain Text and the Requirements of Reasoned Decision-making.**

The Court should strike down CMS's Final Rule because it violates the statute.

Contrary to Congress's commands, CMS's new forced decertification system (1) fails

to apply both process and multiple outcome measures, (2) decertifies organizations

and exposes others to replacement with no evaluation of their actual performance, and

(3) fails to account for material differences between service areas, which is necessary

to accurately evaluate organizations' comparative performance.

**A.    The Final Rule violates Congress's command to rely on both "process" measures and "multiple outcome" measures.**

Congress understood that when making recertification decisions, it would be

important for CMS to assess organizational performance against accurate and reliable

measures of organ donor potential and other related factors relevant to each

organization's assigned service area. *See* 42 U.S.C. § 273(b)(1)(D). CMS's Final Rule

defies the statute's plain text because it does not incorporate any process measures and

does not rely on multiple outcome measures when making recertification decisions. It also exceeds CMS's authority because it mechanically applies an arbitrary 25% cutoff that subjects large numbers of organizations to decertification or potential replacement without making any judgment as to the actual quality of any organization's performance. The Final Rule is also invalid because the outcome metrics are calculated based entirely on a flawed calculation of organ donor potential and, contrary to Congress's directions, fail to account for "other related factors in each service area."

### 1.    The Final Rule fails to rely on "process" measures.

The statute's plain text directs that, when determining whether organ procurement organizations meet "performance standards" as part of a four-year recertification process, CMS must "rely on" both "outcome *and process* performance measures." 42 U.S.C. § 273(b)(1)(D)(ii)(I), (II) (emphasis omitted). In addition, CMS must "use *multiple* outcome measures." *Id*. § 273(b)(1)(D)(ii)(III) (emphasis added); *see Turner v. U.S. Att'y Gen.*, 130 F.4th 1254, 1258 (11th Cir. 2025) (when interpreting a statute, courts begin "with the language of the statute itself" (quotation marks omitted)). Congress made clear that the standards CMS applies must be based "on empirical evidence … of organ donor potential *and other related factors* in each service area of qualified organ procurement organizations." 42 U.S.C. § 273(b)(1)(D)(ii)(II) (emphasis added).

These statutory mandates are supported by Congress's legislative findings. *See Caster v. Allen*, 2025 WL 1643532, at *204 (N.D. Ala. May 8, 2025) (enacted "legislative findings" are entitled to "substantially more weight" than legislative history), *cert.*

*petition filed*, No. 25-243 (U.S. Sept. 3, 2025). Congress emphasized that CMS must improve the "overall" recertification process by "incorporating process as well as outcome performance measures." 42 U.S.C. § 273 note. That followed from Congress's finding that CMS's "exclusive reliance" on limited outcome metrics—at the time, population-based measures of donation and transplantation rates—did "not permit consideration of other outcome and process standards that would more accurately reflect the relative capability and performance of each organ procurement organization." *Id*.

The distinction between process and outcome measures is well established, and Congress's statutory directives are grounded in sound policy. *See United States v. McLymont*, 45 F.3d 400, 401 (11th Cir. 1995) (per curiam) (court "must assume that Congress used the words of the statute as they are commonly and ordinarily understood"). Process measures "track the performance of a particular action," such as the techniques or methods applied to improve, while outcome measures evaluate the "results of actions and mechanisms." 80 Fed. Reg. 13,569, 13570 (Mar. 16, 2015) (discussing ways "to measure the quality of a wide variety of services"). Instead of considering only ultimate outcomes, process measures "assess the extent to which" planned activities and best practices "lead to feasible and sustainable programmatic outcomes." 84 Fed. Reg. 47,956, 47,957 (Sept. 11, 2019).

Relying on narrow outcome measures to make significant performance decisions is inappropriate because "an outcome is the result of numerous factors, many beyond providers' control." *Types of Health Care Quality Measures*, https://www.

20

ahrq.gov/talkingquality/measures/types.html. Outcome measures are "clearly neither sensitive nor specific measures of quality," can "induce perverse incentives," and are unable "to discriminate between good and poor performers." Richard J. Lilford et al., *Use of Process Measures to Monitor the Quality of Clinical Practice*, 335 BMJ 648, 649 (2007), *available at* https://pmc.ncbi.nlm.nih.gov/articles/PMC1995522/. Because of their limitations, when outcome measures are used to evaluate performance, they must be balanced with appropriate process measures. *Cf.* 84 Fed. Reg. at 47,957 (discussing collecting data from a "mix of process and outcome measures" to evaluate performance of local education agencies). Moreover, it is essential to apply "multiple" measures when seeking an accurate and reliable assessment of performance. *See* OPM, Guiding Principles for Performance Measurement—A Supervisor's Quick Guide (2025) (noting the parable of three blind men who come across an elephant, and explaining the need for multiple measures).

The Final Rule does not apply any *process* measures when evaluating performance over the four-year recertification period, as Congress mandated. *See* RR-50–51 (§ 486.316). The Final Rule instead requires that organizations be decertified based on only two narrow outcome metrics—the organization's donation rate and its transplantation rate—calculated over a 12-month period. *See* RR-21 (explaining that Tier 3 organizations will be decertified, and Tier 2 organizations will be subject to replacement). That violates the statute's plain text, which requires CMS to "rely on" process measures (in addition to outcome measures). 42 U.S.C. § 273(b)(1)(D)(ii)(II).

CMS's narrow approach means that an organization that is steadily improving over a four-year recertification cycle could be decertified or replaced if it experiences a decrease in its calculated donation or transplantation rates over the 12-month assessment period. It also means that organizations are evaluated based only on outcomes that are beyond their control. The Final Rule recognizes that organizations can improve performance by adopting "better techniques and methods associated with organ procurement." RR-32, but it does not even attempt to measure those efforts when making recertification decisions. It instead mandates decertifying organizations—even those that successfully implement best practices and techniques—when they experience comparatively lower donation or transplantation rates over a 12-month period.

### 2.    The Final Rule fails to apply "multiple" outcome measures.

The Final Rule is also invalid because it does not apply *multiple* outcome measures of performance. 42 U.S.C. § 273(b)(1)(D)(ii)(II). CMS's two metrics are too closely related to qualify as separate measures, a problem that is exacerbated by the reality that neither metric is substantially within the control of the organ procurement organizations themselves. *See* David W. Baker & Mark R. Chassin, *Holding Providers Accountable for Health Care Outcomes*, 167 Annals of Internal Med. 418 (2017) ("An outcome measure should be used only if the outcome can be influenced substantially by providers … so that differences in outcomes are truly attributable to differences in the care provided").

22

CMS's two metrics are calculated using the same denominator: "donor potential." Donor potential is determined by CMS using death-certificate data that reflects the number of inpatient deaths within a service area "from patients 75 or younger with a primary cause of death that is consistent with organ donation." RR-51. As explained below, the data CMS has chosen is flawed and fluctuates significantly over each 12-month period. But even if those concerns are put to one side, CMS's decision to use the same common denominator—which is the foundation (the "whole") against which the numerator is compared—violates the statute because it means that the agency's outcome metrics are not independent measures of performance. *See* RR-1044 (noting studies showing that an organization that has a lower donation rate will also almost always have a lower transplantation rate); RR-188, RR-791; RR-56 (acknowledging "concerns" that metrics "may seem redundant and highly correlated").

CMS's failure to apply multiple outcome measures is compounded by the fact that the transplantation rate is plainly not a measure of the performance of the organ procurement organizations themselves. RR-774 (noting that measuring "transplant success, instead of procurement success" puts recertification "in the hands of the transplant centers"). Whether an organ is transplanted depends on a variety of factors, including (most importantly) the performance and medical judgment of transplant surgeons. *See* 42 U.S.C. § 274c(4) (recognizing that different transplant centers have different costs and patient outcomes). The transplantation rate cannot be controlled by

23

any individual organ procurement organization, which neither decides which organs are appropriate for transplant nor performs any transplant. *See* Compl. ¶¶ 8, 11.

CMS admits that organ procurement organizations cannot control transplantation rates but asserts that they may be able to "influence" "transplant hospital practice" through their advisory boards. RR-57. According to CMS, this indirect, advisory influence makes it the organizations' responsibility "to ensure that ['less than perfect'] organs are transplanted, instead of discarded." *Id*. But that off-hand response only confirms that CMS has violated its statutory obligations. Advisory boards typically include only local transplant surgeons, and many transplants occur at centers outside an organization's service area. *See, e.g.,* Compl. Ex. D, Sanchez Decl. ¶ 15; Compl. Ex. G, Gill Decl. ¶ 32. More fundamentally, it makes no sense to hold organizations responsible for medical judgments made by transplant surgeons subject to transplant center policies. Organ procurement organizations have no clinical expertise or practical ability to makes those judgments, and CMS's own regulations discourage transplanting "less than perfect" organs. *Cf.* Compl. ¶¶ 145–146 (explaining that, because of how CMS evaluates transplant centers, transplant surgeons have incentives to discard lower-quality organs). A non-profit organization's entire existence—whether it is decertified or potentially replaced—should not turn on its ability to exert attenuated "influence" over medical decisions it cannot control.

If CMS believes that "influence" is important, that should be addressed through an appropriate process measure, evaluating whether organizations have processes in place to facilitate the transplantation of "less than perfect" organs. The Final Rule's

24

decision to decertify organizations based on an outcome—a transplantation rate—over which they might only have some "influence" confirms that the transplantation rate is not a fair or precise measure of performance. *See* Compl. Ex. B, Lehrman Decl. ¶ 24 ("[T]he current framework lacks the ability to distinguish between high-performing organizations that are excelling in the areas they can control and those whose performance is artificially constrained by factors beyond their influence.").

**B. Congress did not authorize CMS to impose a hunger-games style, decertification scheme.**

CMS's Final Rule further violates the statute because, for each recertification cycle, it decertifies or threatens to replace any organization that does not fall within the top 25% in either its donation or transplantation rate. CMS thus intends to shut down large numbers of organizations each review cycle based not on any objective measure of their *actual* performance but instead based *only* on their *comparative* donation and transplantation rates. CMS's system is a type of "hunger games" approach, as it will inevitably cause consolidation over time and, ultimately, the decertification of all but one organization. No matter how well organizations perform overall, CMS's rule jeopardizes the continued operations of any organization not falling within the top quartile during each recertification cycle. CMS has never justified this arbitrary cutoff, which contravenes the system that Congress designed.

If Congress had wanted CMS to apply such a draconian and disruptive approach, culling organizations from the program based only on a comparison of their respective donation and transplantation rates, it would have said so. *See Koons Buick*

*Pontiac GMC, Inc. v. Nigh*, 543 U.S. 50, 63–64 (2004) (noting courts should apply common-sense interpretations of statutes and, had Congress intended to take a different approach, it would have been clear). Determining "upon what differences a distinction may be made for the purpose of statutory classification" is a "matter of legislative judgment," *Int'l Harvester Co. v. Missouri*, 234 U.S. 199, 215 (1914), and Congress never authorized CMS to sort organizations into different tiers and decertify or replace organizations in the bottom tiers. *See Va. Uranium, Inc. v. Warren*, 587 U.S. 761, 765 (2019) (noting courts' "duty to respect not only what Congress wrote but, as importantly, what it didn't write"). To the contrary, CMS's "job is to make rational and informed decisions on the record before it in order to achieve the principles set by Congress." *Qwest Corp. v. FCC*, 258 F.3d 1191, 1202 (10th Cir. 2001) (striking down 135% benchmark, because "picking a compromise figure is not rational decision-making"). It cannot apply "handy, arbitrary rule-of-thumb criteria" in the place of the "inquiry and deliberative judgment" that the statute requires. *Mitchell v. Adams*, 230 F.2d 527, 529 (5th Cir. 1956).

CMS's decision to decertify organizations without evaluating the quality of their actual performance is directly at odds with these bedrock principles and Congress's findings in 2000 criticizing CMS for relying on limited outcome metrics. 42 U.S.C. § 273 note. The statute's plain text requires CMS to exercise *judgment* by establishing "performance standards" and re-certifying organizations by evaluating their activities against those standards (and not against each other). 42 U.S.C. § 273(b)(1)(D). The statute also directs that CMS must evaluate whether an

organization "meet[s]" the required performance standards by applying multiple outcome and process "measures." *Id.* § 273(b)(1)(D)(ii). As Congress explained, CMS is supposed to establish a process to "accurately measure performance differences among the organ procurement organizations." 114 Stat. at 2347.

These express requirements are reflected in the statute's overarching structure. *See Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 437 (2019) (courts should "consult[]" a statute's "text and structure"). Congress wanted a stable system that would continue to improve by encouraging organ procurement organizations to implement best practices. The statute instructs CMS to implement a plan to "improve federally supported or conducted organ donation and recovery activities, including, when appropriate, the establishment of *baselines* and *benchmarks* to measure overall outcomes of these programs." 42 U.S.C. § 274f-4(c)(5) (emphasis added). It also expresses Congress's expectation that CMS would identify "the most effective donation and recovery practices" and ensure that those practices are successfully implemented. *Id.* § 274f-4(c)(1); *see also id.* § 274f-3. But CMS has abdicated its responsibility in favor of mechanical and fatally flawed arithmetic.

These provisions are rendered "insignificant" if organ procurement organizations are evaluated not based on whether they meet actual "performance standards" but instead based only on their comparative donation and transplantation rates. *See Corely v. United States*, 556 U.S. 303, 314 (2009) (courts should avoid interpretations that render provisions "inoperative or superfluous, void or insignificant" (quoting *Hibbs v. Winn*, 542 U.S. 88, 101 (2004)); *TRW Inc. v. Andrews*,

27

534 U.S. 19, 29 (2001) (courts should avoid interpretations that "would in practical effect render" statutory language "entirely superfluous"). Nothing indicates that Congress granted CMS authority to decertify organizations based not on any evaluation of their actual performance, assessed against baselines established by the agency, but based instead only on the mechanical application of an arbitrary 25% cutoff. *See* RR-14 (estimating that less than half, only 24 organizations, would meet performance criteria).[2]

That one organization has a lower donation or transplantation rate than others over a single 12-month period says very little about their actual performance. Both could be failing or both could be exceptional. Context matters. No one could say, for example, that Olympic silver and bronze medalists are inadequate performers merely because they are not in the top 25% in a single race. Similarly, no one could say that takers of the Foreign Service Exam have performed well merely because they fall within the top 25% on a single test (historically only 2–3% are offered positions). As these examples show, a comparison is meaningless without understanding the context that distinguishes between adequate and inadequate performance.

---

[2] CMS asserts that, by applying a confidence interval, organizations would not necessarily have to fall within the top 25%, and that applying a cutoff serves the goal of "driving all OPO performances to cluster with the top performing OPOs." RR-14. But it recognized that more than 50% of organizations could be decertified or subject to replacement, *see id.*, and it cannot plausibly deny that over time its system will result in consolidation as the pool of organizations is reduced through decertification (as today's higher-ranked organizations become tomorrow's lower-ranked organizations).

28

Nothing in the Final Rule explains what donation or transplantation rate corresponds to an acceptable level of performance. *See* RR-16 (asserting that agency applied the 25% cutoff because it resulted in a "diversity of OPOs serving a range of geographic areas and different donor potentials," but providing no explanation why the 25% cutoff is a reasonable measure of actual performance); *see also id.* (recognizing "that there may be a rate at which OPOs cannot improve anymore" but never identifying what that rate might be). Moreover, the problems with CMS's arbitrary cutoff are exacerbated by the fact that the tier to which an organization is assigned can turn on less than a 1% difference in calculated rates. *See* RR-30 (table 1 showing that, when adjusted within a 95% confidence interval, a donation rate of 11.25% is in tier 1, while a donation rate of 11.18% is in tier 2); *see also id.* (showing that a donation rate of 9.77% is in tier 2, while a donation rate of 9.68% is in tier 3). A single donor can be the difference between recertification and decertification or replacement. RR-30. No one disputes that an 11.18% rate is lower than an 11.25% rate. But nowhere does the Final Rule explain why that difference matters or why 11.25% reflects satisfactory performance but 11.18% reflects failing performance. That is especially problematic because the Final Rule does not account for differences in conditions in the different service areas that are beyond the ability of any organization to control but have a material effect on donation and transplantation rates.

### C.   The Final Rule fails to measure performance "based on" "organ donor potential and other related factors in each service area."

Even if CMS had authority to decertify or replace organizations based on only their *comparative* performance, the Final Rule violates the statute because those metrics do not account for "related factors in each service area." 42 U.S.C. § 273(b)(1)(D)(ii)(II). If decertification turns on a comparison of rates, it is essential that the rates accurately reflect comparative performance with a high degree of precision. CMS's Final Rule fails that test because its limited outcome metrics provide no measure of each organization's success (or failure) in responding to different challenges in their respective service areas. *See Ark. Reg'l Organ Recovery Agency, Inc. v. Shalala*, 104 F. Supp. 2d 1084,1090 (E.D. Ark. 2000) (striking down performance standards that relied on flawed data, did not give organ procurement organizations an opportunity to explain their performance, and failed to account for geographic and demographic factors that influence performance).

The statute requires CMS to apply process and multiple outcome measures that "are based on empirical evidence" of not only organ donor potential but also "other related factors *in each service area*." 42 U.S.C. § 273(b)(1)(D)(ii)(II) (emphasis added); *see also See* 42 U.S.C. § 274f-4(c)(1) (requiring reports examining donation practices across "all populations, including those with low organ donation rates"). Congress included those requirements in its 2000 amendments because government and expert reports criticized CMS for applying limited outcome metrics that did not take into account that "service area populations can differ greatly" in characteristics such as

"causes of death, absence of certain diseases, and being in a certain age group." GAO, No. GAO/T-HEHS-98-131, Organ Donation: Assessing Performance of Organ Procurement Organizations 6 (Apr. 8, 1998). Responding to those criticisms, Congress directed CMS to "test" its measures to ensure they "accurately measure performance differences …." 42 U.S.C. § 273 note.

These directives are consistent with record evidence establishing that service areas are distinguished by demographic and geographic variations that result in disparities in death rates, attitudes toward donations, causes of death and secondary diagnoses that allow for or prevent donation, and access to and distance between donor hospitals and transplant centers. *See* RR-637–638, RR-720–721, RR-809–811, RR-832, RR-1122, RR-1253–1256, RR-1277–1278, RR-1643, RR-1694, RR-1714, RR-2029, RR-2722, RR-2728, RR-3168. As the complaint and its attached declarations explain, donation and transplantation rates are directly affected by geographic and other factors outside the control of an organ procurement organization, including the location and distance between hospitals and transplant centers, and the performance of healthcare providers at those hospitals and transplant centers. *See* Compl. ¶ 132; *see* Compl. Ex. D, Sanchez Decl. ¶¶ 13–32 (describing unique geographic and demographic challenges in facilitating donation and transplantation in Puerto Rico). Other factors beyond the control of any organization in a single 12-month period include the occurrence of natural disasters; changes in population size; shifts in the socio-economic status of populations in the service area; the incidence of chronic disease; and other racial, ethnic, religious, and cultural characteristics that can impact the

31

availability of transplantable organs and donor authorization rates in a service area. Compl. ¶¶ 133–134; *see also* Compl. Ex. B, Lahrman Decl. ¶ 33 (discussing challenges posed by natural disasters in Florida); Compl. Ex. C, Rabel Decl. ¶¶ 25–44; Compl. Ex. E, Garimella Decl. ¶¶ 34–41.

CMS acknowledged that many of these factors "pose hurdles," but it refused to adjust its two metrics to reflect these factors. *See* RR-13. As explained below, many of its assertions are unreasonable and unreasoned. More fundamentally, by focusing solely on whether to "risk adjust" its metrics for evaluating organ donor potential, CMS violated the statute. Congress directed CMS to look at "other related factors" beyond organ donor potential, because it recognized that the challenges faced by organizations are not captured in that limited calculation.

Congress's directions reflect on-the-ground realities that CMS would have understood if it had tried to test its measures to ensure that they are accurate and reliable. It is irrational to compare donation and transplantation rates in the Puerto Rico service area to rates in service areas encompassing densely populated mainland cities served by multiple, easily accessible transplant centers. Such a comparison ignores the many challenges that Puerto Rico faces, including that almost all transplant centers are located more than 1,000 nautical miles away, and the difficulties of coordinating travel from an island. *See* Compl. Ex. D, Sanchez Decl. ¶¶ 13–32 (describing geographic and demographic challenges to donation); *see also* RR-1176, RR-1282–1283, RR-1298–1299, RR-1526 (comments).

In short, CMS's Final Rule violates the statute because its overlapping outcome metrics—donation and transplantation rates—are based only on a flawed calculation of organ donor potential and do not capture "other related factors in each service area." 42 U.S.C. § 273(b)(1)(D)(ii)(II). Nor has CMS ever "tested" its two metrics to ensure they accurately measure performance. The result is a rule that is both over- and under-inclusive. Ignoring the challenges of individual service areas, CMS forces the decertification or replacement of organizations that are implementing best practices and performing well given the challenges posed by their unique service areas while covering up organizations that are failing in more favorable conditions. That is not what Congress intended or required.

## II.    The Final Rule's Tiered-Ranking Decertification System Is Arbitrary and Capricious and Not Reasonably Justified.

CMS's Final Rule violates the requirements of the Administrative Procedure Act because it is not "rational," "reasonably explained," or "based on consideration of the relevant factors." *State Farm*, 463 U.S. at 42–43, 52. By narrowly considering only donation and transplantation rates over a 12-month assessment period, CMS's tier-ranking system is not a reasonably accurate or reliable indicator of performance. *See Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 828 (D.C. Cir. 1983) (an agency's "duty is to implement [applicable] statutory mandates in a rational manner."); *Constellation Mystic Power, LLC v. FERC*, 45 F.4th 1028, 1043 (D.C. Cir. 2022) (per curiam) (an agency "must at all times demonstrate the markers of 'principled and reasoned decision[making] supported by the evidentiary record'" (quoting *Emera Me.*

33

*v. FERC*, 854 F.3d 9, 22 (D.C. Cir. 2017)). As a result, it is unreasonable—and contrary to the requirements of reasoned decision-making—to decertify or replace organizations based only on CMS's limited outcome metrics.

### A.    CMS's Final Rule relies on data that is filled with errors, significantly fluctuates, and is not a reliable measure of donor potential.

Even if it were proper for CMS to make decertification and replacement decisions based solely on two related outcome metrics, it at least needed to ensure that the metrics it used would be based on reliable data. It failed even that basic obligation.

### 1.    CMS's justification is based on a clear misreading of a study.

CMS's limited outcome metrics are calculated using flawed death certificate data to determine the "donor potential" denominator. The denominator is based on county-level national mortality data derived from death certificates maintained by the states and territories and aggregated in the Center for Disease Control's Multiple Cause of Death Mortality Data ("MCOD"). The evidence shows (and CMS does not dispute) that this dataset reflects high rates of errors. *See* RR-1700 (literature review shows that inaccurate reporting of cause of death 30–60% of the time); RR-1447. As many comments explained, the data is unreliable for assessing donor potential because it includes large numbers of deaths with absolute contraindications to donation, such as cancers, infections (sepsis), and non-ventilated deaths—meaning that patients who could never qualify as donors are counted. *See* RR-2280, RR-186, RR-809.

CMS's Final Rule acknowledges these concerns, conceding the high error rate and even recognizing that the data does not identify "exact, true donor potential." RR-

34

11; *see also* RR-9 ("we are aware of the error rates in the death certificate data reported in the literature"). Unable to defend the accuracy of the death-certificate data, CMS instead justifies using the dataset on grounds that it reflects "standardized, reasonable, and objective criteria." RR-11. According to CMS, the error rates do not matter because—CMS assumes without evidence—the errors would not vary from organization to organization, and the same errors would "likely plague other potential data sources." RR-9 ("[w]e are not aware of differences in the error rates that would disadvantage one DSA over another DSA"). In other words: "it all evens out in the end." To support its position—the lynchpin of CMS's entire analysis—the agency cites a single study that it claims shows that adjusting the data (using CALC-adjusted data) to account for "cancers, sepsis and ventilator status" would "not alter" the ranking of organ procurement organizations. RR-13 (citing David S. Goldberg et al., *Addressing Critiques of the Proposed CMS Metric of Organ Procurement Organ Performance: More Data Isn't Better*, 104 Transplantation 1662 (2020)).

The statements made by CMS are false and confirm that the agency has not complied with reasoned decision-making requirements. The study states only that the different datasets are "correlat[ed]" and "highly concordant in absolute terms." RR-2602; *see also* R-2603 (suggesting that metric is "objective, standardized, and verifiable"). But showing that two datasets are correlated means only that there is a relationship between them; it does not mean that the data will result in the same outcomes. *See Datamax Applied Techs., Inc. v. Brown & Brown, Inc.*, 2022 WL 3597311, at *4 (11th Cir. Aug. 23, 2022) (per curiam) (quoting dictionary definitions of

35

"correlation"); *Cf. Brown v. Ent. Merchants Ass'n*, 564 U.S. 786, 800 (2011) (correlation is not evidence of causation). More specifically, nothing in the single study on which CMS relied purports to demonstrate that adjusting data to account for contradictions, such as cancer, sepsis, and ventilator status, would not result in significant changes. *See* Compl. Ex. L at 2 § 1 ("To our knowledge, no studies have directly examined the validity of death certificate data or the year-to-year variability in the new metrics").

There is no evidence in the record supporting CMS's suggestion that a different dataset would not change how organizations are ranked and whether they are subject to decertification. *See La. Wildlife Fed'n, Inc. v. York*, 761 F.2d 1044, 1054 (5th Cir. 1985) (per curiam) (when an assumption plays a "critical role" in the agency's decision-making, "it must, at the very least, be well-founded"); *see also Ga. Pub. Serv. Comm'n v. United States*, 704 F.2d 538, 545 (11th Cir. 1983) (decision arbitrary and capricious when there is "no evidence" in the record to support agency's position). Other studies have demonstrated that adjusting CMS's data would have dramatic consequences in how organizations are ranked. Looking at data from 2018 to 2021, the year-to-year reclassification rate is dramatic, with the use of adjusted data "leading to significantly different tier assignments." Compl. Ex. L at 6 § 4.

CMS's acknowledgement that the MCOD data is flawed (RR-9)—and the lack of any scientifically valid basis for concluding that adjusting the mortality data would not change the agency's tier rankings—is another reason it should have applied multiple process and outcome measures. *See Greater Yellowstone Coal. v. Kempthorne*, 577 F. Supp. 2d 183, 210 (D.D.C. 2008) (agency action arbitrary and capricious where

36

agency relied on "admittedly inaccurate … data"); *see also Lands Council v. Powell*, 395

F.3d 1019, 1036 (9th Cir.), *as amended* (Jan. 24, 2005) (agency action arbitrary when its

methodology was based on "inaccurate" data). CMS's choice to apply outcome

metrics based on flawed data and a misreading of a study's conclusions is a "clear error

in judgment" that cannot be allowed to stand. *State Farm*, 463 U.S. at 43 (quoting

*Bowman Transp. Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 285 (1974)).

### 2. CMS has no reasoned response to evidence establishing that 12-month assessment period is too short.

CMS's Final Rule is also arbitrary and unreasoned because, even though

Congress contemplated recertification "not more frequently than once every four

years," *see* 42 U.S.C. § 273(b)(1)(D), CMS's recertification system relies on only a 12-

month snapshot of data. *See* RR-17. Given Congress's clear instruction that CMS

should measure performance over a four-year cycle, CMS faces a heavy burden to

prove that 12-months of data is appropriate. That is especially the case because CMS's

12-month approach to decertification is unprecedented compared to how it evaluates

other healthcare entities. *See* Compl. Ex. G, Gill Decl. ¶ 16. It stands in sharp contrast,

for instance, to CMS's initiative proposing a six-year evaluation period for transplant

centers. *See* 42 C.F.R. § 512.547.

Commenters identified serious flaws in the agency's decision to apply only 12-

months of data—including evidence demonstrating that donation and transplantation

rates (as calculated by CMS) vary significantly from year to year regardless of objective

performance and concerns that a single year does not account for year-over-year

37

improvement or show long-term trends. *E.g.,* RR-821, RR-1051, RR-2255. Year-to-year variability occurs even in the absence of an extraordinary circumstance. RR-821, RR-1051, RR-2255. Moreover, the problems with using only 12 months of data have been repeatedly confirmed. Studies demonstrate that there is "substantial year-to-year variability," with "[m]inor performance differences" resulting in an organization being placed "in a higher or lower tier, even when its performance is similar" to other organizations. Compl. Ex. L at 6 § 4.

CMS failed to address these concerns and ignored the empirical evidence that invalidates its adopted scheme. The absence of any reasoned response is grounds alone to strike down the Final Rule. *See Grand Canyon Air Tour Coal. v. FAA*, 154 F.3d 455, 468 (D.C. Cir. 1998) (an agency "must … demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant").

### 3. CMS's calculations fail to account for factors outside the control of any organ procurement organization.

One overarching flaw in CMS's approach is that the donation and transplantation rates in any service area are determined by a large number of factors that are not a reflection of performance by the organ procurement organizations themselves. Congress undoubtedly wanted CMS to apply multiple measures of performance to avoid a situation where CMS is making performance determinations based on outcomes over which the organizations have little control. CMS even acknowledged that when "extraordinary" circumstances "beyond an OPO's control … negatively impact the OPO's performance," that "could result in an OPO's

performance not being accurately captured by the outcome measures." RR-23. But that has not stopped CMS from adopting outcome measures that, in the ordinary course, are decided by conditions beyond an organ procurement organization's control.

This same overarching problem infects CMS's methodology for calculating donation rates, as its definition of "donor" fails to include "zero organ donors"—donors with zero organs transplanted. RR-6. As commenters explained, up to 17% of donors are zero-organ donors, and whether a donor is a zero-organ donor depends on the performance and medical judgment of the transplant center. *See* RR-7, RR-1045–1046, RR-718, RR-797–798, RR-817, RR-984, RR-1081–1082. Organ procurement organizations cannot control whether a transplant center rejects organs or the incidence of certain donor comorbidities that result in higher organ discard rates.

CMS responded merely by noting that organizations should engage in "best practices" to reduce the frequency of zero-organ donors, but that response is irrational. RR-7; *see also* RR-5 (conceding that the agency does not know whether "sharing of best practices … has occurred"). CMS cannot acknowledge that best practices are important and then fail to evaluate which organizations are applying them. *See Cobell v. Salzar*, 573 F.3d 808, 813 (D.C. Cir. 2009) (agency cannot just "throw up its hands" when required to make specific determinations). It is unreasonable to hold organizations responsible for zero-organ donors. CMS's failure to account for medically complex donors thus again highlights the problems of relying on only limited outcome metrics when making recertification decisions. *See* RR-1045–1046.

### B. CMS's outcome metrics do not reasonably or accurately measure performance.

Not only did CMS fail to ensure that its two outcome metrics are reliable and accurate measures of performance, it also irrationally refused to take account of other factors that are relevant to organizational performance. Despite significant objections, CMS failed to provide any adequately reasoned response.

### 1. CMS has never justified failing to account for factors outside the control of any organ procurement organization.

It is arbitrary and unreasonable to compare organizations without accounting for differences in their assigned service areas that have a material impact on donation and transplantation rates. *See Cablevision Sys. Corp. v. FCC*, 649 F.3d 695, 720 (D.C. Cir. 2011) (failure to consider "relevant differences" when making comparisons renders agency action arbitrary and capricious).

Commenters raised evidence demonstrating that CMS's outcome metrics do not take account of material variations in service areas—such as death rates, educational attainment, cultural differences, attitudes towards donation, donor hospital and transplant center performance and concentration, and causes of death and secondary diagnoses (which allow for or prevent donation). *E.g.*, RR-637–638, RR-720–721, RR-809–811, RR-832, RR-1122, RR-1253–1256, RR-1278, RR-1298, RR-1643, RR-1694, RR-1714, RR-2029, RR-2722, RR-2728, RR-3168. These relevant differences should have prompted CMS to find a way to measure performance so as to take into account the different challenges that must be overcome in different service areas. *See Eagle Healthcare, Inc. v. Shalala,* 52 F. Supp. 2d 1, 10 (D.D.C. 1999) (agency arbitrary and

40

capricious for relying on "faulty" study that "compared apples and oranges" by failing "to take account of vast differences" in study sample, including geographic differences); *Ark. Reg'l Organ Recovery*, 104 F. Supp. 2d at 1090 (striking down agency performance standards that relied on flawed data, did not give organ procurement organizations an opportunity to explain their performance, and that failed to take into account geographic and demographic factors that influence performance).

As noted above, CMS's limited outcome metrics also depend on factors that are not reasonably attributable to the organ procurement organizations themselves. For instance, the transplantation rate depends on the location or performance of transplant centers within any given service area. When a service area has few nearby transplant centers, the challenges of successfully recovering and transporting a donated organ increase significantly. Moreover, even when an organ is delivered as quickly and safely as possible, whether an organ is accepted and transplanted is within the discretion and control of transplant surgeons. RR-1131, RR-1589. RR-774 n.1. Transplant centers are evaluated by CMS itself on the long-term survival of patients—creating incentives for surgeons to accept only the highest quality organs for transplant and to decline lower-quality organs. RR-2027. That discretion, which organ procurement organizations cannot control, can dramatically change an organization's transplantation rate.

CMS's response is inadequate and unreasoned, and at times nonexistent. *See Am. Farm Bureau Fed'n v. EPA*, 559 F.3d 512, 525 (D.C. Cir. 2009) (per curiam) (finding EPA's decision arbitrary and capricious because it "too hastily discounted" relevant information); *Am. Radio Relay League, Inc. v. FCC,* 524 F.3d 227, 241 (D.C. Cir. 2008)

41

(agency's inadequate explanation for dismissing empirical evidence rendered decision arbitrary and capricious). CMS attempts to bypass concerns about geographic and demographic differences between service areas by suggesting that it did not see how such differences would result in "a disadvantage to one OPO compared with other OPOs" and that making adjustments for demographic considerations like race could mask poor performance and perpetuate racial stereotypes. RR-12–13. But that breezy response fails to engage with the compelling evidence that numerous factors—including demographics—influence donation and transplantation rates in ways outside of any individual organ procurement organization's control.

CMS cannot apply simplistic metrics that do not accurately measure performance and then contend that no adjustments should be made merely because adjustments could have unintended consequences. Commenters' concerns should have been a reason for CMS to reevaluate its overall approach, including applying congressionally mandated process measures and identifying other appropriate outcome measures. Indeed, given the well understood flaws in relying only on limited outcome metrics to evaluate performance, CMS owed a rational explanation why this evidence did not support the need to include additional performance measures. *See State Farm*, 463 U.S. at 48 (agency acted arbitrarily where it failed to address "logical … alternative way[s] of achieving the objectives of the [statute]"). Instead, CMS dug in its heels and made recertification turn entirely on its two, limited outcome metrics, notwithstanding evidence showing significant variables across service areas have a confounding impact. *See Petroleum Commc'ns, Inc. v. FCC*, 22 F.3d 1164, 1172 (D.C. Cir.

42

1994) (a court "must undo" executive action when the agency "has failed to provide a reasoned explanation, or where the record belies the agency's conclusion").

### 2. CMS provides no reasoned basis for applying a 25% cutoff that threatens to decertify or replace dozens of organizations.

CMS's Final Rule is also unlawful because CMS provides no reasoned basis for applying an arbitrary 25% cutoff. As commenters explained, this cutoff does not accurately or fairly measure actual performance, and CMS has no response. *See* RR-158, RR-184, RR-188, RR-1567, RR-2179; *see also Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 347 (D.C. Cir. 2019) (an agency "f[a]lls short" when it "do[es] not adequately analyze" whether its action "compli[es] with all of the … relevant statutory objectives …, particularly those raised in the public comments"). While stating its goal is to establish appropriate "rewards and incentives," RR-15, CMS has articulated no valid statistically based rationale for selecting a 25% cutoff and no reason to assume that large numbers of organizations are performing so poorly that they should be decertified. *See infra* p. 30; *AARP v. EEOC*, 267 F. Supp. 3d 14, 34 (D.D.C. 2017) (striking down regulation because agency did not explain why imposing a "30% incentive level" test was an adequate or appropriate measure of "voluntariness" under the statute). Nor does CMS's Final Rule address the unsustainability of its approach. *E.g.*, RR-2308, RR-2256. The repeated culling of organizations not falling within the top 25% would require (implausibly) a constant supply of higher-ranked organizations to step in and, over time, result in significant consolidation.

43

As courts have recognized, an unexplained cutoff is "the very essence of arbitrariness." *Bldg. & Constr. Trades Dep't, AFL-CIO v. Martin*, 961 F.2d 269, 277 (D.C. Cir. 1992). The D.C. Circuit invalidated an unexplained regulation requiring a 40% ratio of helpers to journeymen, noting that "unsubstantiated imposition of a fixed ratio in a regulatory scheme based on a statute designed to implement prevailing practices represents the very essence of arbitrariness." *Id*. Similarly, courts have rejected outcome metrics for evaluating performance (in the school context) where the agency chose them because "approximately one quarter of" programs "would fail a test set at that level," but with no "expert studies," "industry practices," or other objective criteria demonstrating that the metrics imposed "appropriately measure[d]" whether a particular program "adequately prepared its students." *Ass'n of Priv. Colls. & Univs. v. Duncan*, 870 F. Supp. 2d 133, 153–55 (D.D.C. 2012); *see also Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1317 (Fed. Cir. 2011) (rejecting use of 25% "rule of thumb" royalty rate as arbitrary and unreliable because it did not relate to specific facts of the case).

### C.    CMS's methodology is statistically biased.

The ranking system established by the Final Rule applies a 95% confidence interval for each service area's donation and transplantation rates. *See* RR-17. An organ procurement organization will be decertified if its donation or transplantation rates, within the 95% confidence interval, fall below the previous year's median rates for all organizations. *See* RR-17, RR-25. Because larger organizations have smaller confidence intervals, the Final Rule is mathematically biased against larger

organizations. *See* RR-17, RR-2113, RR-2145, RR-2741 (citing the analysis of the Scientific Registry of Transplant Recipients). Smaller organ procurement organizations have greater variability in donation and transplantation rates owing to their smaller populations, and because that results in relatively larger confidence intervals, they are more likely to achieve a higher tier regardless of actual performance. *See* Compl. Ex. N (G. Lyden et al., *Are the New CMS Performance Tiers Biased Against Larger OPOs?*, 24 Am. J. Transplantation S531 (2024)). CMS's reliance on a biased confidence interval renders its approach unreasonable. *See Eagle Healthcare*, 52 F. Supp. 2d at 10 (agency arbitrary for relying on study that was not "statistically[] valid").

CMS's Final Rule responds to this issue in a single, two-sentence paragraph, stating that the purpose of the confidence interval was to shield small organ procurement organizations from bias. RR-17. According to CMS, it did "not concur with the commenters' assertion that our methodology is biased against large [organ procurement organizations]; they have a [confidence interval] generated, but because they have more data, their [confidence intervals] are proportionally smaller." RR-17. But that conclusory non-response is not reasonable. An agency cannot try to prevent bias by refusing to hold organizations to the same standards. *See Westar Energy, Inc. v. FERC*, 473 F.3d 1239, 1241 (D.C. Cir. 2007) ("A fundamental norm of administrative procedure requires an agency to treat like cases alike.").

In failing to address evidence showing that the bias against large organ procurement organizations was substantial, CMS failed to offer a reasoned explanation for finalizing a methodology that ran directly counter to the statistically

reliable evidence before it. *See Fred Meyer Stores, Inc. v. NLRB*, 865 F.3d 630, 638 (D.C. Cir. 2017) (agencies are required to "reflect upon the information contained in the record and grapple with contrary evidence"); *see also Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020) (agencies must do more than merely "[n]od[] to concerns raised by commenters only to dismiss them in a conclusory manner"). That is unreasonable and another reason CMS's Final Rule should be vacated.

### III. The Final Rule Fails to Respond to Significant Comments About the Consequences for Patients and the Nation's Donation Network.

CMS's Final Rule should also be invalidated because CMS failed to respond to objections that its decision to decertify large numbers of organ procurements organizations would destabilize the system, harm patients, and cause untold damage to the nation's donation system. *See Perez*, 575 U.S. at 96 ("An agency must consider and respond to significant comments received during the period for public comment."); *Grand Canyon Air Tour Coal.*, 154 F.3d at 468 (agency "must … demonstrate the rationality of its decision-making process by responding to those comments that are relevant and significant").

Commenters emphasized that CMS's proposed 25% cut-off would result in "massive decertification … [and] would significantly disrupt the system likely leading to a substantial decrease in donation." RR-178. Instead of "focusing attention" on organizations that may be underperforming, CMS's new approach "dismantle[s] effective programs and create[s] uncertainty and chaos." *Id.*; *see also* RR-180 (noting that CMS's proposed rule "could create huge disruptions … that could lead to more

deaths, not fewer"); *see also* RR-158, RR-184, RR-188, RR-1567, RR-2179, RR-2308, RR-2256. The Final Rule upends the reliance interests of organizations that have spent decades investing in building ties to underserved communities in reliance on Congress's directions for CMS to evaluate performance over a four-year period based on consideration of multiple process and outcome measures, and not based only on limited metrics that wildly fluctuate and do not accurately measure performance.

The disruption that CMS's Final Rule is expected to cause is staggering. By its own recent data, CMS will automatically decertify as many 10 organizations and replace as many as 16 more—nearly half of the nation's 55 organizations. *See* Compl. ¶ 115. Nothing in the rule explains why this makes sense or even how these changes can occur without harming patients and decreasing donation. *See, e.g.*, Compl. Ex. H, Myer Decl. ¶¶ 69–81 (explaining harm to patients); Compl. Ex. D, Sanchez Decl. ¶¶ 39–41 (same). On this issue, CMS's regulations are self-contradictory. *See Gen. Chem. Corp. v. United States*, 817 F.2d 844, 846 (D.C. Cir. 1987) (per curiam) (agency action was arbitrary and capricious because its analysis was "internally inconsistent and inadequately explained"). The regulations state that when an organization is replaced, CMS cannot select a successor unless it has considered "information and data that describe the barriers in its service area, how they affected organ donation, what steps the [organization] took to overcome them, and the results." 42 C.F.R. § 486.316(b). Yet CMS refuses to consider those factors when deciding whether to decertify or replace an organization in the first instance.

More broadly, CMS's Final Rule expects organizations assigned to Tier 1 to take over organizations that are decertified (assigned to Tier 3) or at risk of being replaced (assigned to Tier 2). It does not attempt to explain how a high-ranking organization serving a comparatively smaller and homogeneous service area is equipped to take over a larger and more diverse area without any experience in or connections to that area. The unexplained assumption that existing organizations can replace decertified ones and improve performance in a different service area "fundamentally misunderstands how the nation's non-profit donation system is set up and the amount of work that individual organ procurement organizations undertake within their individual donation service areas to increase organ donation." Compl. Ex. F, Conrad Decl. ¶ 30. As one of the nation's highest-ranked organizations has explained, "it is unreasonable to expect that other non-profit organizations will be able to step into the shoes of those existing organizations that are decertified and barred from participating in the nation's organ donation network." *Id.* ¶ 41. Indeed, CMS expects to decertify large numbers of organizations that have operated for decades, but it has no explanation why mass decertification will not cause precisely the harms, uncertainty, and interference with organ donation that Congress expressly sought to avoid. 42 U.S.C. § 273 note.

In light of the harms that will result if more than half of the nation's organ procurement organization are at risk of being decertified or replaced, the only appropriate remedy is to vacate the Final Rule. As the Eleventh Circuit has long recognized, when an agency violates a statute or the requirements of reasoned

decision-making, vacatur is "the ordinary APA remedy." *Ins. Mktg. Coal. Ltd. v. FCC*, 127 F.4th 303, 317 (11th Cir. 2025) (quotation marks omitted). That remedy is particularly appropriate where, as here, an agency has "exceeded its statutory authority," which is a "serious defect," *id.*, committed an error that "incurably taint[s]" its decision-making process, violates essential statutory safeguards, or fails to address issues central to its decision. *Am. Sec. Ass'n*, 147 F.4th at 1279 (quotation marks omitted).

## CONCLUSION

Plaintiffs request that the Court grant their motion for summary judgment.

Dated: October 30, 2025

Respectfully submitted,

BRIGID A. MERENDA
  Florida Bar No. 0320500
RICHARD M. HANCHETT
  Florida Bar No. 0709212
TRENAM, KEMKER,
SCHARF, BARKIN, FRYE,
O'NEILL & MULLIS, P.A.
101 E. Kennedy Boulevard
Suite 2700
Post Office Box 1102
Tampa, FL 33602
(813) 227-7427
bmerenda@trenam.com
ranctil@trenam.com

*Co-Counsel for
Plaintiff LifeLink Foundation, Inc.*

/s/ *Mark D. Polston*
MARK D. POLSTON
  D.C. Bar No. 431233 (*pro hac vice*)
KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
mpolston@kslaw.com

*Lead Counsel for Plaintiffs*

VAL LEPPERT
  Florida Bar No. 97996
KING & SPALDING LLP
Southeast Financial Center
200 S Biscayne Boulevard, Suite 4700
Miami, FL 33131
(305) 462-6000
vleppert@kslaw.com

ASHLEY C. PARRISH
  D.C. Bar No. 464683 (*pro hac vice*)

49

KING & SPALDING LLP
1700 Pennsylvania Avenue NW
Washington, DC 20006
(202) 737-0500
aparrish@kslaw.com

ADAM ROBISON
  Texas Bar No. 24035497 (*pro hac vice*)
CHRISTIE CARDON
  Texas Bar No. 24036326 (*pro hac vice*)
KING & SPALDING LLP
1100 Louisiana Street, Suite 4100
Houston, TX 77002
(713) 751-3200
arobison@kslaw.com
ccardon@kslaw.com

*Counsel for Plaintiffs*
*LifeLink Foundation, Inc., OneLegacy,*
*Iowa Donor Network, LifeCenter*
*Northwest, and LifeGift Organ Donation*
*Center*

50

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Plaintiffs' Motion for Summary Judgment and Incorporated Memorandum of Law** was filed with the Court's CM/ECF system on this 30th day of October 2025, which will send a notice of electronic filing to the following CM/ECF participant:

Stephanie Smith Leuthauser
US Attorney's Office - FLM
Suite 3200
400 N Tampa St
Tampa, FL 33602-4798
813/274-6000
stephanie.leuthauser@usdoj.gov

*Counsel for Defendants*

/s/ *Mark D. Polston*
MARK D. POLSTON
 D.C. Bar No. 431233 (*pro hac vice*)

*Lead Counsel for Plaintiffs*